850

5-3882                                    402 S. W. 2d 675

Opinion delivered May 16, 1966

*Mitchell D. Moore,* for appellant.

*Maddox & Van Ausdall,* for appellee.

Ed. F. McFaddin, Justice. This litigation arises because of a traffic mishap which occurred in Memphis, Tennessee,[1] in October 1963. The vehicle in which appellee, D. H. Lamb, was seated had stopped at a traffic light when a truck owned by the appellant, Buchanan Chevrolet Company, and driven by its employee and co-appellant, James Ward, struck the rear of the Lamb vehicle, resulting in alleged injuries to Mr. Lamb. For such

---

[1]The fact that the mishap occurred in Tennessee is important to note at the outset because of one of the instructions later copied.

injuries he filed this action, which resulted in a verdict and judgment in his favor, and from such judgment the appellants prosecute this appeal, presenting, under various points, the matters now to be discussed.

## I.

*Negligence.* Appellants claim that they were free of any negligence because their witnesses testified that the foot brake on the truck which Ward was driving suddenly failed, due to a leak in the fluid line, and that such failure was unexpected and unavoidable. The jury gave no weight to this defense, and the evidence supports the verdict. Without objection, the Court instructed the jury:

> "You are instructed that there is a statute in Tennessee requiring every motor vehicle operated upon a highway to be equipped with brakes adequate to control the movement of and to stop and hold such vehicle, including two (2) separate means of applying the brakes, each of which means shall be effective to apply the brakes to at least two (2) wheels. You are further instructed that violation of a statute is negligence *per se.*"[2]

Ward, the driver of the truck, admitted that when the foot brake failed he made no effort to apply the emergency brake, claiming that he did not have time to do so. One of the allegations of negligence was that Ward was following too close to the vehicle in front of him, and the jury could well have found this allegation to be true when the driver admitted that there was no time to apply the emergency brake after the foot brake failed. Furthermore, it was shown that the truck which Ward was driving was more than ten years old and no thorough checking of the brake system was shown. On this matter of the sudden failure of the brakes, we call attention to our cases of *Brand* v. *Rorke,* 225 Ark. 309, 280 S. W. 2d 906;

[2]Without objection, the Court applied the Tennessee law in this case, as above stated. Of course, the Arkansas rule is that failure to comply with the statute is merely "evidence of negligence." *Mays* v. *Ritchie Grocer Co.,* 177 Ark. 35, 5 S. W. 2d 728; *Browder* v. *St. L. S. W. Ry. Co.,* 221 Ark. 773, 256 S. W. 2d 333.

*Pitts* v. *Greene,* 238 Ark. 438, 382 S. W. 2d 904; and *Houston* v. *Adams,* 239 Ark. 346, 389 S. W. 2d 872.

## II.

*Cross Examination Of Dr. Forestiere.* Mr. Lamb claimed that in the collision he sustained a whiplash injury which caused him great suffering and permanent injury. To sustain his claim he called Dr. A. J. Forestiere, a regular practicing physician in Poinsett County, who testified that he examined and treated Mr. Lamb on October 31, 1963 (the date of the injury) and had subsequently examined and treated Mr. Lamb up until the time of the trial. Dr. Forestiere testified:

> "Well, he came in complaining with an injury to his neck and head. Complaining of his back hurting. On examination, the diagnoses I listed at that time, were, whiplash type injury involving posterior neck muscles and posterior cervical ligaments and hematoma formation involving the occipital area of the skull. Putting it in layman's terms, that is a blood clot at the back of the head and a sprain of the lumbar area of the spine, right side, lower back. X-rays were made at that time. It was ascertained there were no fractures or dislocations. However, he did show on the neck x-rays a diminution of the joint spaces between the lower cervical vertebra and hypertrophy area changes in the vertebra, lumbar spine level, small changes . . . .

> "A. . . . 'Whiplash' is a layman description, itself. It is a snapping. Better term would be acute flexion-extension of the neck due to a force from behind.

> "Q. Damage usually occurs, results, to what part of the body?

> "A. Usually the neck. Can involve other parts of the spine. Usually, whiplash is referred mostly to the neck.

"Q. When you say 'cervical spine' . .

"A. Cervical spine includes the neck from the base of the skull to the dorsal vertebra at the top of the shoulders.

"Q. When you examined Mr. Lamb that time, did the injury in the cervical spine appear?

"A. No. Not until—he did sustain a mild sprain to the lumbar area of the back.

"Q. Where is the lumbar area?

"A. In the area between the lower part of the ribs and the hip, in layman terms.

"Q. Dr. Forestiere, I believe, you said he was suffering, complaining of pain over his right kidney?

"A. That would include part of the lumbar area, little above it, maybe.

"Q. Dr. Forestiere, as a result of that examination, did you prescribe medicine or treatment for Mr. Lamb?

"A. He was started on analgesics or pain tablets and muscle relaxant tablets and physical therapy in the form of diathermy treatments to the back and neck.

"Q. Subsequent to the examination on October 31st, I think you treated him on 16 different occasions?

"A. That is right."

Then on cross examination appellants' attorney asked Dr. Forestiere:

"Q. Do you know Dr. Nicholas Gotten, then, professionally?

"A. Yes, sir.

"Q. Would you recognize him as an authority on the so-called whiplash?

"A. I would recognize him as an authority on neurosurgical disease.

"Q. That is a particular—

"A. That may or may not fall under it.

"Q. Where does it fall under it?

"A. Where it would fall under it is problematic. For instance, if there is a disk injury involved, it would be a neurosurgeon's job.

"Q. Would you say Nicholas Gotten is qualified to make a diagnosis of a whiplash injury?

"A. I am sure he would be.

"Q. Are you not familiar with the writings of Dr. Gotten?

"A. I don't believe I have had occasion to read all of his writings, or any of them, to my knowledge.

"Q. Would you recognize his writings as any measure of authority?

"A. Yes, sir."

Thereupon, appellants' attorneys sought to ask Dr. Forestiere a question about what was contained in a pamphlet written by Dr. Nicholas Gotten of Memphis, Tennessee, involving whiplash injuries. It was a survey of 100 cases, made subsequent to the settlement of litigation involving whiplash injuries:

"MR. MOORE: I want to ask Dr. Forestiere, 'We were forced by . . . ,' on page three (3) of Defend-

ant's Exhibit 'A' the last paragraph on that page. Quote, Dr. Nicholas Gotten, 'We were forced by the survey to draw definite conclusions as respects psychosomatic symptoms which developed in a considerable number of these patients. The medical examiner in his interviews with the patients came to the conclusion in some instances the injury was being used by the patient as a convenient lever for possible gain, so to speak, though not necessarily on the conscious level.' ''

The Court refused to allow the last copied question to be asked Dr. Forestiere; and the correctness of such ruling is the point now before us. Assuming, without deciding, that the point is properly presented here, we nevertheless conclude that the Court was correct in its ruling. A physician may be cross examined concerning a recognized medical text with which he is familiar. (*Scullin* v. *Vining*, 127 Ark. 124, 191 S. W. 924.) But Dr. Forestiere stated that he did not know of, and had never read, the Gotten writing, about which the appellants' attorney sought to cross examine him. Thus, the rule stated in the cited case has no application to the case at bar. The article by Dr. Gotten is in the record before us and is a report of what Dr. Gotten, and others, concluded from examination of 100 persons claimed to have sustained whiplash injuries. The appellee Lamb was not one of those persons so examined; so, in effect, to allow Dr. Gotten's article would be to proceed from a few specific cases to the particular case before the jury.

By the cross examination the appellants were cleverly attempting to put before the jury Dr. Gotten's views, without having him present to testify as a witness. If the appellants had thought Dr. Gotten's testimony worthwhile, they could have had him examine Mr. Lamb, and then Dr. Gotten could have testified. The Court was correct in its ruling refusing the question on cross examination. On this matter of seeking to introduce written articles as evidence instead of having the author of such article present to testify, attention is called to our recent

case of *Davis* v. *Ark. Best Freight,* 239 Ark. 632, 393 S. W. 2d 237, which has some slight bearing on the point here.

### III.

*Excessiveness Of The Verdict.* The jury awarded Mr. Lamb $16,391.00 as damages, and the appellants claim that this amount is grossly excessive. Without objection, the Trial Court instructed the jury as to the elements of damages to be considered.[3] The facts in the case at bar bear a striking resemblance to those in the case of *Breitenberg* v. *Parker,* 237 Ark. 261, 372 S. W. 2d 828. In the cited case, Mr. Parker was a man 63 years of age and had always been well and active until he received a whiplash injury. The jury awarded him a verdict for $20,000.00, and we held that the verdict was not so grossly excessive as to shock the conscience of the Court. In the case at bar, Mr. Lamb was a man 62 years of age at the time of receiving his injury, and he sustained a whiplash injury under circumstances entirely similar to those in the adjudicated case. In the case at bar, Mr. Lamb was awarded $16,391.00 as damages. The rule as to the province of this Court in regard to reducing a verdict is well stated in *Ark. Amusement Corp.* v. *Ward,* 204 Ark. 130, 161 S. W. 2d 178:

---

[3]The said instruction read:
"You are instructed that if by your findings herein the plaintiff, D. H. Lamb, is entitled to recover, you should assess as his damages such a sum of money as you find, from a preponderance of the evidence, will reasonably compensate him for his injuries, and in this connection you may take into consideration the following:
(A) For his pain and suffering in the past and for such pain and suffering as you find from a preponderance of the evidence he will reasonably be expected to endure in the future.
(B) For any permanent or partial disabilities he may have had or will have in the future by reason of the injuries directly attributable to the collision.
(C) For the reasonable cost of hospitalization, drugs and medical treatment, and any other expenses reasonably incurred to date.
(D) Any loss of earning which plaintiff has sustained or will sustain in the future by reason of said injury and in this connection you are told that if he was unable to accept a job at a higher rate of pay than his present job, because of his physical injuries sustained in this accident, then you should take this into consideration."

"A verdict will be set aside by an appellate court as excessive where there is no evidence on which the amount allowed could properly have been awarded; where the verdict must of necessity be for a smaller sum than that awarded; where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion, prejudice . . . or of some error or mistake of principle, or to warrant conclusion that the jury were not governed by the evidence . . . ."

In *Breitenberg* v. *Parker, supra,* we said:

"Every case involving the issue of excessiveness must be examined on its own facts; and before this Court can constitutionally reduce a verdict we must give the evidence in favor of the verdict its highest probative force and then determine whether there is any substantial evidence to sustain the verdict."

In the case at bar, the evidence shows that when appellants' truck hit the vehicle in which Mr. Lamb was riding his head was thrown against the back of the car with such force as to give him a terrible blow on the head, and this, in addition to the whiplash injuries. Dr. Forestiere detailed the extensive treatment and medication prescribed for Mr. Lamb, from the examination on the date of the injury up to the date of the trial, and stated that Mr. Lamb had suffered permanent injuries. It is furthermore shown that Mr. Lamb, being a man 62 years of age, had some arthritic condition in his neck prior to the injury; but he was entirely ignorant of such condition and it had never given him any trouble; and as a result of this whiplash injury, this arthritic condition has been aggravated and he is now suffering and will probably continue to suffer for a long time to come. We cannot say that this verdict is so grossly excessive as to shock the conscience of the Court.

As a part of this matter of the excessiveness of the verdict, the appellants claim that the Court committed error in allowing Mr. Lamb to testify that, but for this injury, he would have accepted a position that would have brought him far greater remuneration. We find no error committed by the Court in allowing Mr. Lamb to answer such question. What we said in *Rudolph* v. *Mundy,* 226 Ark. 95, 288 S. W. 2d 602, is an answer to the appellants' contention[4].

Finding no error, the judgment is affirmed.

[4]The language referred to is as follows:

"In connection with the contention that the jury's verdict was excessive, appellant says that certain testimony regarding Mrs. Cassidy's earning capacity was improperly introduced. We do not think the record supports appellant's contention in this matter. After Mrs. Cassidy had testified that she had a top rating with the Soil Conservation Service as senior secretary, she was asked if she had recently had an offer from that agency. Appellant objected to this question on the ground that it was self serving. Mrs. Cassidy then stated she had a letter from her immediate boss offering her a job. Appellant objected on the ground that the letter was the best evidence. Following this the letter was offered in evidence and marked Exhibit 6, though it does not appear in the record. This was not a self serving declaration on the part of Mrs. Cassidy and her testimony was properly introduced."