ARKANSAS AMUSEMENT CORPORATION *v.* WARD.

4-6691                                            161 S. W. 2d 178

Opinion delivered April 20, 1942.

Tom F. *Digby* and *Cockrill, Armistead & Rector,* for appellants.

*Sam Robinson* and *Fred A. Isgrig,* for appellees.

HOLT, J. March 29, 1940, appellees, Fay Ward, Wayman Ward, her husband, and Melba Bryant, sued appellants for damages growing out of a collision between a panel-bodied truck owned and operated by Arkansas Amusement Corporation and a parked sedan automobile in which appellees were sitting at the time. A jury awarded Fay Ward $34,500 for personal injuries, $5,000 to her husband, Wayman Ward, for expenses following his wife's injuries and damages to his automobile, and $1,000 to Melba Bryant for personal injuries. From judgments on these verdicts comes this appeal.

For reversal appellants urge (1) that the proceedings in the trial court were void; (2) that error was committed in the introduction of certain X-ray pictures; (3) that they were entitled to a reversal on the ground of newly discovered evidence; (4) that the trial court erred in refusing a continuance and in refusing to require witness', Mrs. Strickland's, personal attendance at the trial; and (5) that the verdicts are excessive. We proceed to consider these assignments in the order in which they are presented. It is conceded that a case of liability was made for the jury as to each of the appellees.

I

Appellants' first argument for a reversal is that the proceedings in the lower court were *coram non judice* and that, therefore, the judgments against them are null and void. This argument is discussed under three separate headings, (a) that the March, 1941, term of the third division of the Pulaski circuit court lapsed on May 21; (b) that Judge Auten, judge of the second division of said court, had no authority to preside at the trial of this cause in the third division thereof; and (c) that the

March, 1941, term of the third division of said court lapsed on May 12. These questions were not raised in the court below and are not mentioned in the motion for a new trial, but we assume that they may be raised here for the first time.

Arguments under headings (a) and (c) relate to an exchange agreement between Judge Waggoner of the Lonoke circuit court and Judge Utley of the third division of the Pulaski circuit court, in which it was agreed that Judge Waggoner should preside over Judge Utley's court for six days named in the agreement, to-wit: May 12, 13, 14, 15, 19 and 20, 1941. It appears that Judge Waggoner did not appear and open the third division court on May 12, but that same was opened by Judge Auten of the second division who adjourned the court to May 13, when Judge Waggoner did appear, opened court and held court on the other days named in the agreement, and continued to hold said court on May 21, 22 and 26. Now, the contention is that, because Judge Waggoner did not appear on May 12, the first day of his exchange agreement, the term lapsed for the reason no other judge of the Pulaski circuit court could open said division or adjourn same. Also that because Judge Waggoner held said court on days after May 20, days not covered by his exchange agreement, the proceedings on said extra days are void and the term lapsed. Whether appellants are right or wrong in these contentions is not now decided, because they have not shown any interest in the court proceedings on these days. Their cases were not tried by Judge Waggoner on any of the days named or at all. They were tried before Judge Auten of the second division of said court, and, unless the latter had no power or authority to try these cases, appellants certainly would have no right to question or upset the proceedings had before Judge Waggoner while presiding over the third division of said court.

The record shows that these cases were docketed in the third division and that they were tried before Judge Auten of the second division with the third division jury, and, while the record does not show it, the cases were tried in the second division courtroom. So, it appears to

us that the effect of what happened was that the cases were transferred by agreement to the second division for trial, and were there tried and the record thereof made in the third division·records. This action did not render the judgments void, for, by § 8 of Act 64 of the Acts of 1913 which provides for an additional circuit judge of the 6th circuit and regulates the practice in the Pulaski circuit court, it is provided that: "It shall not be reversible error that any case is tried in a division to which it has not been specially assigned." These cases, having been tried before Judge Auten of the second division, cannot, therefore, be reversed because they were tried in a division to which they had not been specially assigned, regardless of whether the third division may or may not have been in session.

## II

Appellants contend that the trial court erred in permitting, over their objection, the introduction of certain X-ray pictures of Fay Ward made at the Baptist Hospital and exhibited and interpreted by Dr. Hayes.

It appears that Dr. Hayes, in the course of his testimony on behalf of appellees, was permitted to place the X-ray pictures in question in a shadow box and testify and interpret from them. While he did not make the pictures himself, he identified them as having been made in his presence and under his direct supervision. In these circumstances, we think no error was committed in their introduction.

In *Prescott & Northwestern Railroad Co.* v. *Franks,* 111 Ark. 83, 163 S. W. 180, this court held (quoting headnote No. 3 from the Arkansas Reports): "An X-ray photograph, showing an injury to plaintiff, is admissible in evidence, when a practicing physician testifies that he was present when the same was taken, and identifies the photograph introduced in evidence as the one taken of plaintiff."

## III

Appellants next argue that they are entitled to a reversal on the ground of newly discovered evidence. The

alleged newly discovered evidence consisted of affidavits, and testimony at the hearing on the motion, having for their purpose the impeachment of appellees' witnesses, Courtney and Montgomery. The affidavits tended to show that neither of these witnesses was near the scene of the accident when it occurred and that they had sworn falsely.

From one of our earliest cases, that of *Robins* v. *Fowler*, 2 Ark. 133, the rule has been well established that in order to the success of a motion for a new trial, on the ground of newly discovered evidence: ''1. The testimony must have been discovered since the trial. 2. It must appear that the new testimony could not have been obtained with reasonable diligence on the former trial. 3. It must be material to the issue. 4. It must go to the merits of the case, and not impeach the character of a former witness. 5. It must not be cumulative.''

After a careful review of the record on this point, we are convinced that no error was committed in denying the motion, for the reason that the alleged newly discovered evidence was in the nature of impeachment testimony only. The granting or refusing such motion is left to the sound discretion of the trial court, and unless it appears that this discretion has been abused, we will not reverse here.

In *Bradley Lumber Co.* v. *Beasley,* 160 Ark. 622, 255 S. W. 18, where the affidavits tended to show that certain witnesses, who testified that they were present when a certain happening occurred, were in fact not present and had sworn falsely at the trial, this court said: ''Moreover, the testimony of Johnson and his wife on the matter set out in the affidavits was in the nature of impeachment testimony of the Smiths (§ 4187, C. & M. Digest); and it has been held by this court that newly discovered evidence which goes only to impeach or discredit a witness is not ground for a new trial. *Murphy* v. *Willis,* 143 Ark. 1, 219 S. W. 776; *Hayes* v. *State,* 142 Ark. 587, 219 S. W. 312; *Plumlee* v. *St. L.-S. W. Ry. Co.,* 85 Ark. 488, 109 S. W. 515; *Tillar* v. *Liebke,* 78 Ark. 324, 95 S. W. 769; *Jones* v. *State,* 72 Ark. 404, 80 S. W. 1088; *Minkwitz* v. *Steen,* 36 Ark. 260.''

In *Arkansas P. & L. Co.* v. *Mart,* 188 Ark. 202, 65 S. W. 2d 39, this court said: "This court has many times held that motions for a new trial on account of newly discovered evidence are addressed to the sound discretion of the trial court, and that this court will not reverse for failure to grant unless an abuse of such discretion is shown. *Forsgren* v. *Massey,* 185 Ark. 90, 46 S. W. 2d 20."

## IV

It is next argued that error was committed in refusing a continuance of the cause and in refusing to require Mrs. Strickland's personal attendance at the trial. It appears from the record that at the time of the trial Mrs. Strickland resided in Searcy, Arkansas, and was in a delicate condition on account of impending childbirth and physically unable to appear. Her testimony was taken on interrogatories and cross-interrogatories and introduced at the trial.

Appellants rely upon § 5220 of Pope's Digest which is as follows: "Where it is made to appear, by the affidavit of a party and the written statement of his attorney, that the testimony of a witness is important, and that the just and proper effect of his testimony cannot, in a reasonable degree, be obtained without an oral examination before the jury, the court may, at its discretion, order the personal attendance of the witness to be compelled, although such witness may otherwise be exempt from personal attendance by law."

It is made clear under this section that the personal attendance of a witness, otherwise exempt (§§ 5217, 5219, Pope's Digest), lies within the sound discretion of the trial court. This appellants frankly concede. We are unable to say in the circumstances here, however, that an abuse of discretion has been shown.

## V

Finally appellants urge that the verdicts are excessive, and we think this contention must be sustained.

The record reflects that about eleven a. m., November 8, 1939, appellees were driving in a Terraplane sedan

north on Cross street in the city of Little Rock, Arkansas, when they reached a point about fifteen feet from Garland avenue (a cross street). Appellees brought their car to a stop about two feet from the right curb of Cross street to permit traffic to clear the intersection immediately ahead. The three appellees were sitting on the front seat of their car, Wayman Ward under the steering wheel, Melba Bryant next to the right front door and Fay Ward sitting between with the gear shift lever between her knees. While in this position appellants' panel-bodied truck, driven at about forty miles an hour south on Cross, collided with a car driven by Mrs. Strickland near the intersection of Garland avenue and Cross street, causing the Strickland car to run into a telephone pole and the truck to turn over, falling upon and striking the front of the left front fender, radiator grill of appellees' car, smashing and flattening the tire on the left front wheel and otherwise damaging the front of the car. The evidence does not disclose that appellees' car was moved perceptibly from its stationary position by the impact from appellants' truck.

After the collision, appellees got out of their car through the right door. Melba Bryant testified that she stepped from the car onto the curb. As to what happened when the impact came, Fay Ward testified: "Q. What happened to you when that truck came into your car? A. I saw and realized that the truck was going to hit us, and I was in the middle of the car astraddle the gear shift, and I braced my feet for it, to brace myself. When the truck hit our car, it threw us and the car up in the air, but as I started to go up in the air my knees caught the dashboard, and it pushed me suddenly down and forward. I broke the gear shift off with my stomach and my knees, but I stayed down. I didn't go up very high."

Melba Bryant testified that the impact caused her forehead to strike, and cause a crack in the upper right corner of the windshield. The windshield was not shattered. A large knot formed on her forehead. She received no broken bones. One of her ribs was made sore, and she had it taped up. Since the collision, she has been nervous and cries at times. When sixteen years of age,

she was operated on for appendicitis and in February, 1939, before the injury which she received in the collision, she was operated on for adhesions resulting from the appendectomy, and at intervals since the latter operation has taken "shots."

Wayman Ward's injuries were of a minor nature and he did not sue for physical damages.

After appellees got out of their car Fay Ward fainted and was taken to the office of a physician. Shortly thereafter she was removed to a hospital in Little Rock where she was placed in a cast in which she remained for about eight weeks. Since the removal of this cast she has worn a padded steel brace to support her back. At the time of the trial, Fay Ward was twenty-seven years of age. About six years before the trial, she underwent an abdominal operation, but says she had never had any trouble with her back. Since the collision she has undergone much pain and suffering. She was asked: "Q. Can you go to entertainments like you used to? A. No, lots of times I go to church on Sunday morning when I am able because I enjoy going to church, and at night my husband always rides me around awhile. It's the only time I get out. It's the only way I have to go. . . . Q. Have you tried walking any down town? A. Yes, I walked two or three times, oh, more than that, I would say a dozen times. One time down town I got so bad I just didn't have any use of my limbs, and if it hadn't been for my lady friend with me, I would have dropped on the sidewalk. Q. How long ago was that? A. About the 10th of last month. . . ."

Dr. Donald Hays, who treated Fay Ward in his office and at the hospital, testified from X-ray pictures made of her back in his presence and from a diagnosis. As to her injuries we quote from his testimony: "Q. What do those pictures and your diagnosis disclose to you about the condition of Mrs. Ward? A. That she had a broken back, that is a fracture through the left pedicle of the fifth lumbar vertebra and a partial dislocation of the lumbar sacral point permitting the spine to slide forward on the sacrum. The sacrum is the large bone

in the back of the pelvis. . . . Now, of course, if any of these vertebrae from the head down to the pelvis is broken in any part, we speak of it as a broken back.''

He further testified from the X-rays that after the cast was removed that the fracture had not healed, but that her condition was worse; that her disability would continue and he considered her to be permanently and totally disabled. He advised a fusion operation and called in Dr. Walter Carruthers, a specialist in this line, who concurred in his view. These specialists testified that these operations which are major in their nature, were not always successful and even though successful she would always have a stiff back.

There was evidence that Fay Ward fell some five or six steps down a stairway at a dance hall in Fayetteville, Arkansas, in 1931 before the injuries complained of here. She testified that no injury to her back resulted from this fall.

Taylor Hannah, a police officer in Fayetteville, Arkansas, and who has lived there about twenty-eight years, testified that he has known Fay Ward since her early childhood and that he knew she had something wrong with her back in 1931; that at that particular time he was wearing a brace himself and was interested in anybody else who might be wearing one and further: ''I don't remember whether I accidentally bumped into Fay or whether I just met her on the street. Anyhow, the conversation came up and Fay was walking rather stooped, and I am under the impression now, and was then, that she either had tape on her back or had some sort of brace on. Either that, or her back was so sore she couldn't bend it, because she moved in one piece. . . . Q. How do you know her back was stiff? A. By the way she moved. . . . And, of course, she told me that she did have a stiff back; that her back had been hurt.''

Dr. M. D. Ogden, a specialist, testified for appellants that he took X-ray pictures of Fay Ward and that they showed essentially the same condition that was mentioned by Dr. Hayes and Dr. Carruthers. ''Q. Doctor, you have

heard the medical testimony in this case and from all the facts found by the other doctors, and from your own examination, are you of the opinion that this slippage existed before the accident? Now, of course, I realize you can't— A. If I had to guess, I would say that it existed before the accident. There is no way to be positive about that, and that guess would be on the fact that the fracture is together and the slippage is still there.''

Another specialist for the appellants, Dr. Hollenberg, testified hypothetically, basing his conclusions on the testimony of the other physicians, as to conditions that were shown by X-ray to be present in the back of Mrs. Ward, that Fay Ward's condition was due to a cause pre-existing the collision of the car and truck in question. He further testified that Fay Ward's condition, the proper medical term for same being spondylolisthesis, is congenital in about five per cent. of all cases.

The evidence is very voluminous and it would unduly extend this opinion to attempt to abstract it at greater length. That Fay Ward received some injury is conceded. Her injuries were determined by X-ray pictures although she claimed other injuries which were only subjective. At the time of her alleged injuries the undisputed proof is that she was sitting on the front seat of the car cushioned between her husband and Melba Bryant with the gear shift lever between her knees. The impact caused her to bounce up from her seat, not forward. Melba Bryant was thrown forward, according to her testimony. There is no evidence that the car in which appellees were sitting moved from its position. Photographs in evidence of appellees' car show that the left front fender and radiator grill were smashed along with the tire on the left front wheel.

Wayman Ward, who sat nearest the left front fender, was not injured and the injuries to Melba Bryant were slight.

In any view of the evidence, as reflected by this record, we think the jury's verdict of $34,500 in favor of Fay Ward clearly excessive and not within the range of the evidence adduced.

The rule is well settled in this state that a jury may not be left without some restraint in the matter of assessing damages. In *Aluminum Company of North America v. Ramsey*, 89 Ark. 522, 117 S. W. 568, this court announced the rule in this language: "It has been frequently said that it is difficult to find a measure of damages for pain, for the obvious reason that none would be an acceptable inducement to suffer it; but when it has occurred the compensation as such must be considered upon a reasonable basis of estimate. Under our system of jurisprudence, the amount of damages must be left largely to the reasonable discretion of the jury. Again, we may say, it has been repeatedly held that they may not give any amount they please."

In the very recent case of *Missouri Pacific Trans. Co. v. Simon, et al.*, 199 Ark. 289, 135 S. W. 2d 336, this court re-affirmed the rule announced in the Ramsey case and said: "When our views are firmly fixed in respect of a miscalculation by jurors, or of a mistake that has been made through sympathy, prejudice, or partiality, and the record sustains our conclusions that the extrinsic elements or considerations referred to have entered into the result, it then becomes our solemn duty either to reverse and remand for another trial, or to give judgment here for a sum we think justified, and to eliminate any excess that is not sustained by substantial evidence."

Quoting further from the opinion: "The rule is stated in Corpus Juris Secundum, vol. 5, § 1650, as follows: 'A finding of value or the amount of damages is so much a matter within the exclusive province of the jury that it will ordinarily not be disturbed by the reviewing court where the issue has been fairly submitted under proper instructions, unless palpably without support in the evidence presented at the trial, unless the jury have departed for the same reason from the legal measure of damages, or unless the verdict is so palpably excessive or grossly inadequate as to indicate bias, passion, prejudice, corruption, outside influence, or mistake, or shock the conscience or sense of justice, or unless manifest error therein otherwise appears. . . . However, (p. 646) it has been held that an appellate court may or must

interfere if the verdict is not reasonably within the range of the evidence, or where there has been an abuse of discretion, or if it appears to be the result of passion and prejudice. . . . Since the duty of guarding against excessive verdicts (§ 1651) rests to a great extent on the trial judge, who will presumably not allow excessive verdicts to stand, the authority invested in appellate courts to disturb the verdict of the jury on the ground of excessive damages is one which should be exercised with great caution and discretion. . . .

" 'A verdict will be set aside by an appellate court as excessive where there is no evidence on which the amount allowed could properly have been awarded; where the verdict must of necessity be for a smaller sum than that awarded; where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion, prejudice . . . or of some error or mistake of principle, or to warrant conclusion that the jury were not governed by the evidence. . . .' "

The verdict of $5,000 in favor of Wayman Ward we think clearly excessive under the following instruction which was given at plaintiffs' request: "You are instructed that if you find for the plaintiff, Wayman Ward, you will assess his damages at such a sum as will reasonably compensate him for the damages to his automobile, if any, and the amount of money expended for medicine and medical attention for his wife, if any, and the amount of money, if any, that the evidence shows, it will be necessary for him to expend in the future for medicine and medical attention for his wife, if any, and from these as proven by a preponderance of the evidence, assess such damages as will reasonably compensate him for his damages, if any."

This instruction limited Wayman Ward's recovery to the damages to his automobile and the present and future medical expenses of his wife. He asked nothing for loss of services and consortium. There is evidence

that his total recovery under the above instruction would not be more than $2,709.90, which would include an estimated $1,500 for an operation, hospitalization and attendant expenses. It is our view in the circumstances that a judgment for $5,000 would be excessive.

We are also of the view that the judgment in the amount of $1,000 for Melba Bryant is excessive on the facts before us. As a result of the impact of the car and truck she received a knot on the forehead, no bones were broken. While she testified that since the accident she is more nervous than before, there is no substantial evidence showing permanent injury.

Under the rule followed in the Simons case—that a miscalculation by jurors, if materially affecting the verdict, must be corrected—we think error is clearly reflected in the instant appeal. There must have been failure to consider evidence relating to Fay Ward's former injuries—injuries testified to by Taylor Hannah; and there must have been assumption, amounting to speculation that the relatively slight movements of the automobile in which appellees were sitting at the time of collision produced all the consequences of which Fay Ward complains. The very size of the verdict is conclusive of the proposition that it was *assumed* all of the injuries, pain and attending inconvenience resulted from the contact.

On the whole case, we have concluded that a judgment for more than $15,000 for Fay Ward, $3,750 for Wayman Ward, and $750 for Melba Bryant would not be warranted. If, therefore, appellee, Fay Ward, will within 15 days from the date of this opinion, enter a remittitur of the judgment in her favor to $15,000, and appellees, Wayman Ward and Melba Bryant, will within said time, enter remittiturs in their judgments to $3,750 and $750, respectively, then the judgments will be affirmed as to those accepting the reduction; otherwise, the judgments will be reversed and the cause remanded for a new trial.

HUMPHREYS, J., (dissenting). A majority of the court are reducing the verdicts or reversing and remanding this cause for a new trial on the ground that each verdict was excessive. The verdict in favor of Fay Ward was for $34,500 for personal injuries. The verdict in favor of Wayman Ward, her husband, was for $5,000 for expenses following his wife's injuries and expenses he will have to incur in the future on account of her injuries and for damages to his automobile. The verdict in favor of Melba Bryant was for $1,000 on account of personal injuries she received.

It is admitted by appellants that there is substantial evidence in the record to sustain each verdict for some amount, but they argue that the amount of each verdict was excessive. In order to reach this conclusion, they set out some of the evidence, but, in my opinion, have not set out or even mentioned a large part of the substantial evidence tending to show the extent of the injuries and the amount of damages resulting therefrom. The evidence is in sharp conflict as to the extent of the injuries and the amount of damages in dollars and cents each sustained as a result of their respective injuries. In view of the conflicting evidence it was within the exclusive province of the jury to determine the extent of the injuries received and the amount of damages that each sustained. These matters were within the exclusive province of the jury to determine just as much as it was within the jury's exclusive province to determine the question of liability. The extent of the injuries received by each and the pain and suffering resulting therefrom were purely questions of fact to be determined by the jury and not questions of law which are always determined by the courts.

Of course, there is the exception that if it is apparent from the record that the verdict of the jury is a result of passion and prejudice or without any substantial evidence to support same, then the Supreme Court may reverse verdicts and consequent judgments and either remand the cause for a new trial or dismiss the action. The Supreme Court has no right to reverse judgments or reduce them based upon verdicts of juries for any other reason than those just stated. *Missouri Pacific Rd. Co.* v. *Creek-*

*more,* 193 Ark. 722, 102 S. W. 2d 553; *Humphries* v. *Kendall,* 195 Ark. 45, 111 S. W. 2d 492; *Mutual Life Insurance Company* v. *Springer,* 193 Ark. 990, 104 S. W. 2d 195.

There is nothing in this record indicating that the verdicts were the result of passion and prejudice or that they were returned by a jury arbitrarily and without evidence to support them.

The Constitution of Arkansas of 1874, art. II, § 7, says:

"The right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy."

Section 1490 of Pope's Digest is as follows: "Issues of law must be tried by the court. Issues of fact, arising in action by proceedings at law for the recovery of money, or of specific real or personal property, shall be tried by a jury, unless a jury trial is waived."

This case was tried by a jury of twelve men, duly selected and qualified, and the verdicts returned by them should not be disturbed by the Supreme Court.

I assert, without the fear of successful contradiction, that the jury in the instant case reached correct conclusions as to the extent of the injuries sustained by Fay Ward and Melba Bryant for personal injuries received by each and also a fair and just amount in favor of Wayman Ward for the expenses he paid out and will have to pay out on account of his wife's injuries and the amount he received on account of damages to his automobile. In support of my assertion that the jury reached the correct conclusion I am going to quote at length from the testimony of Fay Ward:

". . . I realized the truck was going to hit us and when it came into our car I was in the middle, straddling the gearshift, and I braced my feet for the collision. When the truck hit our car it threw us and the car up in the air, but as I started to go up in the air my knees caught the dashboard and it pushed me suddenly down and forward. I broke the gearshift off with my stomach and my knees, but I stayed down. I didn't go

up very high. The gearshift was one of the old-fashioned ones, on the floor, and I broke it off even with the floorboard.

"We had to get out of our car on the right side because the left door was jammed. Mrs. Bryant got out first. As I started to put my weight on my feet I fainted and Mrs. Bryant caught me in front, my husband caught me behind, and they took me and layed me over on the sidewalk. When I came to there was a crowd of people around me. Our car was several feet from the curb and it was impossible to have stepped out of the car onto the curb as you would have to have mighty long legs. I had a severe pain in my left hip, but I didn't realize I was hurt. I had been living in Little Rock going on six years and I have not had a doctor since I have been here. Someone suggested that we go to Dr. Hayes, I don't remember who it was, but some man volunteered to take us to him. When we got there I was lifted out and carried to his office. From his office I went to the hospital in an ambulance. At the end of three days they put me in a cast. Before that I was so nervous they couldn't do it. They put wooden boards on the bottom of my feet and on each foot they hung a gallon water jug off the foot of the bed and layed me on a frame so I would be perfectly straight and stretched out. I was hurt on Wednesday and before they put me in a cast it was impossible for me to raise even a finger and I suffered the utmost misery. The cast was made of plaster of paris and was very stiff. I could not move from the position they had me in. I was in the cast for eight weeks. During that time the pain was almost unbearable. I had bed sores on every angle, from my feet to my head. After eight weeks the cast was taken off and I stayed in bed two weeks. The doctors then made me a brace and when I got it I could then get up and go to the table for my meals, but it wasn't sufficient support, although I tried to use it between two or three weeks. They then made me another brace and this is the picture of the second brace which I wear during the day all of the time. Sometimes the pain is so bad that I can't remove the brace at night. It is very uncomfortable to sleep in. I never take it off when I am up

and around as it is too much support to my back. When I take it off I just slump clear over and I can't hold my shoulders up. I can't endure the pain. When I have the brace on there is pain and I haven't been free from pain. . . . The brace is made of steel covered with leather. I have the brace on now. At the place where these three strips hit the body there are big bruised spots and this place is rubbed raw. It rubs my arms, too, and I grit my teeth and endure it. My doctors have advised that I have an operation. At first I thought the brace would let this grow back, and I argued against an operation. I have suffered so much now that I am perfectly willing to go through with it. Aside from having an incision in my back I will have some comfort when it is all over. I realize the danger I am going through when I have the operation, but I am still willing to do it so that I can enjoy some of the things other people do. I cannot go to entertainments like I used to lots of times. I go to church on Sunday morning when I am able because I enjoy church and at night my husband always rides me around awhile. This is the only time I get out. I have tried walking down town a dozen times or more. One time down town I got so bad I didn't have the use of my limbs and if it hadn't been for a lady friend with me I would have dropped on the sidewalk. This was about the 10th of May, 1941, and the lady friend's name was Mrs. Rogers. She put her arms around me and practically carried me in Sears-Roebuck & Co. I layed in the rest room for an hour or two and when I was able I went over to Dr. Hayes' office and took a light treatment. We just live a block and a half from town and my husband had to take me to town so that I can go into the stores. I have submitted to doctors' examinations by doctors representing the other side . . ."

Two reputable physicians testified that her back was broken and that her injuries are permanent and not temporary. There was much other evidence supporting the extent of her injuries and the amount of damages to which she was entitled. In view of her own testimony, and the testimony of the other witnesses in her behalf, I do not see how the court can reduce these verdicts or reverse and remand the cause for a new trial.

I might add that the testimony of Wayman Ward as to the damages he sustained and will have to sustain on account of the condition of his wife and the testimony of Melba Bryant, fully corroborated and supported, is just as convincing as to the damages they sustained as is the testimony in the record in support of the verdict of Fay Ward.

Mr. Justice Mehaffy authorizes me to state that he concurs in this dissenting opinion.