BUSBY *v.* WILLFORM

5-3932                                                406 S. W. 2d 131

Opinion delivered September 12, 1966

*Giles Dearing* and *E. J. Butler,* for appellant.

*Shaver* & *Shaver,* for appellee.

GUY AMSLER, Justice. During the year 1962, appellant A. G. Busby (referred to as "Busby" in the briefs) farmed some 500 or more acres of land in Cross County, Arkansas. Appellee Ossie Lee Willform, a twenty year old Negro boy, (referred to by the attorneys as "Willform") was employed by Busby as a farm laborer during busy periods.

On September 5, 1964, Willform filed suit in the Cross County Circuit Court against Busby alleging that while in the employ of Busby on September 16, 1962, (it was later shown that the correct date was July 16, 1962) and acting pursuant to his instructions and using his (Busby's) tools a piece of steel penetrated his left eye, resulting in infection and removal of said eye.

There were also allegations to the effect that when appellee removed the plows from a cultivator and undertook to straighten them: "He used an old four pound hammer which was owned by Mr. Busby and which was defective in that it had been used for a long time and the steel would chip off of the hammer head. The appellee did not know of the defective condition of the hammer head and the softness of the steel, nor of the fact that the steel would chip off of the head of the hammer, and as he was using the hammer to straighten the plow a sliver of steel came off of the hammer, flew through the air and hit the appellee in the left eye; that the appellant did not warn him of the defective tool he used, although he knew that said tool was defective." Furnishing defective tools, knowledge of such defects and failure to warn a minor were alleged as acts of negligence on the part of Busby.

Damages in the sum of $35,000.00 were sought for pain and suffering, medical expense and permanent disability.

Appellant's answer was a general denial with no affirmative defenses offered.

Trial to jury resulted in a verdict for $15,000.00. An appeal was perfected in apt time.

The first point relied on by Busby for a reversal is that there was no substantial evidence on the issues of employment and liability. Millbrook, a former employee of Busby and witness for appellee, testified that he usually worked under the direct supervision of Mr. Busby but that Mr. Busby had told him that if he (Busby) was not around he should get his work instructions from Mr. John Shaw, Busby's son-in-law. He had been familiar with Busby's shop tools since 1957, and they were still being used in 1962. He said that he and other employees used the tools in repairing farm machinery under directions from Busby or Shaw. He also stated that when a three pound ball peen hammer is used to beat on hot steel over a period of time it gets hard and starts to flake. On the questions of employment and liability appellee related that on the morning of the accident when he finished plowing about 10:00 o'clock he drove back to the shop and asked Mr. Shaw for further instructions. Shaw told him that Mr. Busby said for him (appellee) to take the shanks off both rear cultivators and set the "cultivator foots." Then appellee was asked:

"Q.  Now, did you do what Mr. Shaw told you to do?

A.  Yes sir I straightened— I straightened— I think I straightened two shanks—two shank parts of the plow, and the third I started with the steel and it hit me in the eye. When I got straight to see what happened I looked on the plow and didn't see no place broken off, and looked at the hammer, there was a fresh piece chipped off."

Appellee also testified that he never received any

warning from Busby regarding the hammer. He further stated that when he got out of the hospital he went to Mr. Busby's house with his brother-in-law and that appellant told them that he (Busby) was using the hammer (sometime previously) and that "a piece sounded like it went through his hat or went through his hat again or something."

Theodis Millbrook, John Wesley Willform and Jessie Willform (relatives of appellee) all testified that Mr. Busby in their presence or to them said that he knew that Ossie Lee was hurt because he (Mr. Busby) was using that hammer one day and a piece of steel or a piece flew off that hammer and went through his hat.

The testimony of appellee and his witnesses was controverted in every essential respect by Busby, Busby's son-in-law and daughter. When the applicable yardstick created by this court many years ago, and which we are unwilling to override, is applied to the point under scrutiny it will be readily seen that appellant's contention must fail. The governing rule (from which there has been no deviation) was succinctly stated in *Baldwin* v. *Wingfield,* 191 Ark. 129, 85 S. W. 2d 689:

"Under our system of jurisprudence it is the province of the jury to pass upon the facts. It is not only their privilege, but their right, to judge of the sufficiency of the evidence introduced, to establish any one or more facts in the case on trial. The credibility of the witnesses, the strength of their testimony, its tendency, and the proper weight to be given it, are matters peculiarly within their province. The law has constituted them the proper tribunal for the determination of such questions. To take from them this right is but usurping a power not given. * * * When there is a total defect of evidence as to any essential fact, or a spark, a 'scintilla,' as it is termed, the case should be withdrawn from the jury." * * * "The settled rule is that, if there is any substantial evidence to support the

verdict of a jury, this court cannot disturb it, although we might think that it was clearly against the preponderance of the evidence, and, if we had to decide the facts, would decide differently.''

The triers of fact elected to accept the evidence of Willform and his witnesses over the proof offered by appellant and we are unwilling to override their conclusion.

Point 2 urged by appellant for reversal is that: ''The trial court erred in permitting Willform to introduce into evidence the mortality table on his life expectancy without explaining to the jury that its use would be limited to future medical expenses.''

This point is argued rather perfunctorily and without citation of authority by either party. Appellee was a young man, twenty years of age, with a life expectancy of 49 years at the time he was injured. There is no question that he will throughout his life suffer some inconvenience, humiliation and discomfort from his permanent injury and disfigurement. Dr. Lewis, who removed Willform's eye, testified: ''It is obvious that he has this false eye.'' There was no objection to this or any other testimony regarding the nature and degree of appellee's injuries. In view of the elements of probable future damage revealed by the evidence the trial court did not commit error in refusing to restrict use of the mortality table to future medical expense.

A third point relied on by Busby for reversal is that: ''The trial court erred in not declaring a mistrial on the injection of the question of insurance into the trial by counsel for Willform.''

On *voir dire* counsel for Willform had questioned prospective jurors concerning their connection with liability insurance carriers. Counsel for appellee admits that this interrogation was ''within bounds.''

In a reasonably short time after he was injured

Willform visited the office of Dr. Thomas Price in Wynne, Arkansas, to obtain treatment for his injured eye. Dr. Price rendered first aid and concluded that Willform's injury was of such a serious nature as to require the attention of a specialist. So he referred appellee to Dr. Phillip Lewis, a noted eye surgeon of Memphis, Tennessee.

On direct examination, Busby testified that around 3:00 p.m. on the day Willform was injured Dr. Price called his home by telephone and talked with Mrs. Busby. Busby was present, heard his wife talking and learned of the accident in this way.

On cross-examination the following transpired:

"Q. Did they ask you for authority to send him?

A. Didn't ask me nothing.

Q. Why did they call you?

A. Just told me.

Q. Did you authorize him to be sent to Memphis?

A. No.

Q. Did you pay his doctor bill?

A. I didn't.

Q. Did you pay part of it?

A. I never wrote my check to anyone for anything in connection with paying the hospital bill.

Q. Did you pay his doctor's bill?

A. I didn't, not with my check.

Q. "Not with my check"?

A. No.

Q.  Do you know whose check paid it; authorized by who?

MR. DEARING: I think he is going too far.

MR. SHAVER: I just asked—

MR. DEARING: He has already gone too far in front of the jury.

COURT: As I understand, counsel asked if he knew who paid the bill. He can answer yes or no.

Q.  The question is do you know who paid the check?

COURT: If you know you can answer yes or no.

A.  Could I ask one question?

COURT: No, sir, answer the question yes or no; do you know who paid it?

A.  This sure puts me on the spot.

COURT: He is not asking who. Just asking if you know.

A.  I would have to say no, I don't know who paid it.

COURT: That is the answer.

MR. SHAVER: That's all I want to know.''

Since appellant referred to the call by Dr. Price in his direct testimony counsel was justified in pursuing the matter further on cross-examination for determining if Busby had, through some act or statement, assumed responsibility for appellee's injury.

During the development of appellee's case in chief it was stipulated that there were unpaid balances on the hospital and doctors bills, amounting to $159.92. The jury could have reasoned that had Busby been protected by insurance the medical bills would have been paid in full.

It is our conclusion that the trial court did not abuse its discretion in denying appellant's timely motion for a mistrial.

Finally appellant contends that the verdict is excessive. Able counsel for both parties have cited numerous cases dealing with our decisions relating to damages in tort cases. It would serve no useful purpose to undertake a comparison of the case at bar with all cited cases. Generally each case must be judged on its own facts and if a verdict is supported by substantial evidence it will not be disturbed.

Counsel for Busby fairly states the test to be "that the ultimate question in determining excessiveness of a verdict is whether it shocks the conscience of the court or demonstrates the jurors were motivated by passion or prejudice."

In *Breitenberg* v. *Parker*, 237 Ark. 261, 372 S. W. 2d 828, this court quoted the applicable rule from *Ark. Amusement Corp.* v. *Ward*, 204 Ark. 130, 161 S. W. 2d 178, with this language:

"A verdict will be set aside by an appellate court as excessive where there is no evidence on which the amount allowed could properly have been awarded; where the verdict must of necessity be for a smaller sum than that awarded; where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion, prejudice * * * or

of some error or mistake of principle, or to warrant conclusion that the jury were not goverened by the evidence * * * ."

Appellee is a young laborer with less than a high school education who has no training for skilled employment. His life expectancy is 49 more years. He will be forced to struggle through life as a "one-eyed" workman. No proof is required to establish the fact that two eyes are better than one in any undertaking or that a person with two reasonably good eyes would be chosen for employment over an applicant with only one eye. Appellee's medical expense, past and future, amounts to some $1,500.00 if all goes well. He lost twelve weeks wages, amounting to approximately $840.00. He was in the hospital eleven days and Dr. Lewis testified that he had a "considerable wound" that was penetrating and "had gone through the cornea and sclera of his eye." The doctor also said "he suffered extreme pain." The doctor stated: "It is obvious he has this false eye. He was given antiseptic drops to put under the lid and was advised not to take it out except occasionally and when absolutely necessary. In most cases you have to clean the eye and secretion gets underneath it. Frequently these patients get an infection from wiping the eye with a soiled handkerchief or their hand." The eye is removed, when necessary for cleaning or other purposes, with a little rubber suction and in addition to applying the drops the eye must be polished and cleaned every four months. In short Willform has a lifetime aggravating and troublesome problem on his hands for which he is entitled to be substantially compensated.

In view of the gravity of the injury sustained by appellee we are unwilling to say that the amount awarded by the jury for all elements of unliquidated damages was so grossly excessive (or even excessive for that matter) as to require that it be pared down by this court. The judgment is therefore affirmed.