DOROTHY BRADLEY *v.* BILLY HENDRICKS, INDIVIDUALLY
AND AS FATHER AND NEXT FRIEND OF RANDY LYNN HENDRICKS,
A MINOR

5-5680                                    474 S.W. 2d 677

Opinion delivered January 10, 1972

*Williams & Gardner,* for appellant.

*Felver A. Rowell, Jr.,* for appellee.

J. FRED JONES, Justice. Billy Hendricks, individually and as father and next friend of his five year old son, Randy, filed suit in the Conway County Circuit Court against Mrs. Dorothy Bradley for medical expenses incurred by Mr. Hendricks and for damages sustained by Randy when he was bitten by a dog belonging to Mrs. Bradley. A jury trial resulted in a verdict against Mrs. Bradley for $5,000 damages and for $52.50 medical expenses. Judgment was entered on the verdict and on appeal to this court Mrs. Bradley relies on the following points for reversal:

"There is no substantial evidence that the dog had vicious or dangerous propensities nor that defendant had knowledge that her dog was dangerous.

The verdict and judgment is excessive."

It is well settled in Arkansas that when a person is injured by a domestic animal legally permitted to run at large by its owner, in order for the injured person to recover damages from the owner without the necessity of proving the owner's negligence, it must be shown that the animal has vicious tendencies or dangerous propensities and that the owner knew, or should have known, of such tendencies or propensities. *Field* v. *Viraldo,* 141 Ark. 32, 216 S. W. 8; *McIntyre* v. *Prater,* 189 Ark. 596, 74 S. W. 2d 639; *Holt* v. *Leslie,* 116 Ark. 433, 173 S. W. 191; *Finley* v. *Smith,* 240 Ark. 323, 399 S. W. 2d 271; see also *Cagle* v. *Monroe,* 215 Ark. 518, 221 S. W. 2d 1.

The record reveals that about ten days prior to August 10, 1969, Mrs. Dorothy Bradley, who owned a small Dachshund dog, moved into a house on Moose Street in Morrilton, Arkansas, a few doors from the home occupied by Mr. and Mrs. Hendricks and their children, Randy then three years of age and Delilah then seven years of age. Mrs. Hendricks planned to go out of town on August 10, so by prior arrangement she took her two children next door to the home of Mrs. Dorothy Martin, who was to keep the Hendricks children, along with two other children, until Mrs. Hendricks returned. While Mrs. Hendricks was still preparing to leave on her trip, and while Mrs. Martin was busy about her carport and the children were playing in Mrs. Martin's yard, Randy sustained some injuries to his face and one ear when he was apparently bitten by Mrs. Bradley's dog.

Mrs. Martin testified that she was busy in her carport and when she heard Delilah scream, she ran toward where the children were playing. She says that Delilah brought Randy to her and that he had blood all over him. She says that she then called Mrs. Hendricks who

took the child to the hospital. Mrs. Martin testified that she saw Mrs. Bradley's dog in the yard when Randy was injured, but that she did not see the dog bite Randy. Mrs. Martin testified that one morning when she went out to her garbage can, Mrs. Bradley's dog was there and it growled at her.

Mr. Hendricks, the appellee, testified that Mrs. Bradley's dog had growled at him and on one occasion he saw Mrs. Bradley's dog growl at his daughter, Delilah, and nip at her heels while Delilah was passing in front of the Bradley house on her way to play with a neighbor girl. On this point Mr. Hendricks testified as follows:

"Q. You saw the dog growl at your daughter?

A. Yes, sir.

Q. And what did you say you did?

A. Well, I run down there and run the dog off to keep her from biting her.

Q. Where was it?

A. It was in front of the Bradley house.

\* \* \*

Q. . . . describe to me what the dog did?

A. Well, it run out and growled at her and acted like it was going to bite her.

Q. How close did it get to her?

A. Well, it nipped at her heels

Q. Nipped at her heels, and where were you?

A. I had come out of the house to go back to work.

Q. And it was close enough that it could have reached her heels?

A. Yes, sir.

Q. All right. And you say it growled?

A. Yes, sir.

Q. Did it bark?

A. Yes, sir.

\* \* \*

Q. . . . And did she run?

A. She started to. I told her not to run, because it would take off after her for sure then.

Q. And that's all you did, and she quit running?

A. I picked up a rock and throwed it.

Q. After that, what did you do now?

A. I asked the Bradley lady to put the dog up, because it could bite another child, or bite her again.

Q. You say 'bite her again?'

A. It could bite her, or try it again.

Q. Had your daughter played with the dog any at that time?

A. No, sir. They wasn't allowed to play with dogs."

Mr. Hendricks testified that he went to Mrs. Bradley's house after he got off from work and talked with Mrs. Bradley.

"Q. And what did you tell her?

> A. I asked her to put the dog up, because it tried to bite my little girl today, and I asked her if she would put it up, because I didn't want my little girl hurt."

Mr. Hendricks testified that he knew of no other instance where the dog growled at or attempted to bite any other person.

Mrs. Ella Fay DeLong called as a witness by Mr. Hendricks, testified that on one occasion, as she started out to get into her car, a dog, which she believed to be Mrs. Bradley's dog, growled at her.

Mrs. Bradley testified that she had owned the dog since 1965; that the dog was of a gentle and friendly disposition and had played with children all its life. She testified that she never knew of the dog growling at or attempting to bite anyone. She specifically denied that Mr. Hendricks came to her house and she emphatically denied that he told her that her dog had attempted to bite his daughter. A number of witnesses who had lived as neighbors to Mrs. Bradley testified that the dog was of a docile and friendly disposition; that it played with children and had never shown any dangerous propensities.

This court is bound, of course, by the substantial evidence rule in law cases *(B-W Acceptance Corp. v. Norman Polk,* 242 Ark. 422, 414 S. W. 2d 849) and the evidence in this case presents a close and difficult question under the rule. Mr. Hendricks' little daughter Delilah, who was nine years old at the time of the trial, did not testify in this case, and the record reveals no other eye witness to the occurrence. Mrs. Martin only heard the commotion, saw the dog in the yard, and observed Randy's injuries when Delilah brought him to Mrs. Martin. Mr. Hendricks testified that his children were not permitted to play with dogs, but the injuries sustained by Randy were on his face and ear, so it would appear that he was either on the ground with the dog at the time of the injuries or the dog was in his arms if he were standing.

There is no evidence at all in the record as to what provocation, if any, occurred in this case, but the question of proximate causation is not argued. It is not seriously contended that Mrs. Bradley's dog did not bite the child, so the total lack of any evidence as to whether the child attacked the dog or the dog attacked the child, leaves this case on appellant's first point to be determined strictly on the substantiality of the evidence as to the dangerous propensities of the animal and Mrs. Bradley's knowledge thereof.

Our own cases are of little assistance on this point. In *Field* v. *Viraldo, supra,* the vicious acts of a bull were involved but in that case two previous acts showing vicious propensities were testified to and the owner of the bull admitted his knowledge of its vicious nature. In *Holt* v. *Leslie, supra,* a Bulldog being transported by rail was involved. The suit was against the railroad company and in addition to testimony that the dog would lunge at everyone who came near it, while in the possession and under the control of the station agent, a letter from the consignor to the consignee was introduced wherein it was stated that the dog had previously bitten someone. Warnings were printed on the dog's crate and the consignee testified that he thought he had told the railroad agent that the dog was dangerous.

Turning now to cases from other jurisdictions, in *Young* v. *Cunningham,* 181 A. 2d 109 (R. I. 1962), testimony that a dog had snapped at people on two prior occasions and that injured girl's mother had told the owner that she would not permit her daughter to visit owner's premises unless the dog was tied up was held sufficient on conflicting evidence to justify the trial court in refusing to grant a motion for a new trial following a verdict for the plaintiff.

In the Colorado case of *Barger* v. *Jimerson,* 276 P. 2d 744, evidence showing that a dog which was kept in a fenced yard would lunge at everyone who came by, although it never bit anyone, was held sufficient to sustain a judgment for the plaintiff.

In the Texas case of *Bly* v. *Swafford,* 199 S. W. 2d 1015, the only evidence of the owner's knowledge of the dog's viciousness was the testimony of plaintiff's husband that the owner had stated to him that he (the owner) had told the police on a previous occasion that the dog was vicious. Although the owner denied the statement, the court held that the evidence was sufficient to sustain a judgment for the plaintiff.

On the other hand in the North Carolina case of *Sink* v. *Moore,* 148 S. E. 2d 265, the North Carolina court held that evidence showing a dog's tendency to chase automobiles and fight was not sufficient to support a finding that the dog had vicious propensities and thus the trial court was justified in entering a judgment of nonsuit for the owner.

In the Missouri case of *Mitchell* v. *Newsom,* 360 S. W. 2d 247, the only evidence offered as to the viciousness of the dog was that it barked at trash men; that there was a chain on its doghouse, and the testimony of the plaintiff's mother that she saw the dog jump at another boy and snap at him. The appellate court held that the trial court was justified in directing a verdict for the owner.

In the Louisiana case of *Marsh* v. *Snyder,* 113 So. 2d 5, the defendant owner was walking two dogs on leashes and one of the dogs bit the plaintiff. The owner introduced evidence that the dog was of a mild and docile disposition and his testimony was substantiated by the testimony of three neighbors. On cross-examination the owner admitted that there had been a previous complaint as to the conduct of the dog when it had bitten a child. It was explained, however, that the child had run into the dog while skating and no one was sure whether the dog had bitten the child or not. The plaintiff also offered testimony of her employer that one of the dogs had "nipped" at him. The plaintiff's employer's wife testified that the defendant's wife had told her that the dog had bitten her niece. The reviewing court held that the owner had proven that he had no actual or constructive knowledge that the dog would

hurt anyone and thus reversed the judgment in favor of the plaintiff.

In the case at bar Mr. Hendricks testified that the dog growled at him on more than one occasion as he would go to work. Two other witnesses testified that the dog growled at them, and Mr. Hendricks testified as to the incident already related concerning his little girl. We hold that the evidence was sufficient to take the case to the jury as to the vicious propensities of the dog. The evidence as to Mrs. Bradley's knowledge boils down to a question of credibility and this too, is a question for the jury. *Frazier* v. *Sewell,* 241 Ark. 474, 408 S. W. 2d 597.

Turning now to the appellant's second point; in *Busby* v. *Willform,* 241 Ark. 19, 406 S. W. 2d 131, citing *Ark. Amusement Corp.* v. *Ward,* 204 Ark. 130, 161 S. W. 2d 178, we stated the following rule:

> " 'A verdict will be set aside by an appellate court as excessive where there is no evidence on which the amount allowed could properly have been awarded; where the verdict must of necessity be for a smaller sum than that awarded; where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion, prejudice . . . or of some error or mistake of principle, or to warrant conclusion that the jury were not governed by the evidence. . .' "

In *Busby* we also pointed out that a comparison of one case with others is of little assistance for the reason that each case must be judged on its own facts and if a verdict is supported by substantial evidence, it will not be disturbed on appeal.

In the case at bar the medical bills totaled $55.80. There was no evidence at all as to the *extent* of pain and suffering but the jury could have logically assumed that there was some pain and suffering (Mrs. Hendricks

testified that the child's eyes were closed and his face was twice its normal size the next day following the injury). The evidence was primarily directed to facial disfigurement because of scars. Mrs. Hendricks testified that the wounds on the child's face became infected and that he does still have scars from the wounds. She testified that the scars have improved some within the last few months but not much. She says, however, that they are a lot better than they were. Mrs. Hendricks points out two scars on the child's face and one on his ear as follows:

"Q. Where were the bites you observed?

A. Here and here on his face, and his ear was pierced. They had to sew it up."

The record as to Dr. Thomas H. L. Hickey's testimony pertaining to the scars is as follows:

"Q. All right. Doctor, is there any residual scarring as the result of this dog bite?

A. Yes, sir.

Q. Would you come to the jury please?

A. (He does so)

Q. Randy, would you come over here?

A. (He does so)

Q. Doctor, would you show the ladies and gentlemen of the jury the scars?

A. Here is one right here, and one here. This one here was so bad, the left ear. Can you see them?

Q. Now, I believe there's one between his nose and under his cheek—

A. Right.

Q. Right here?

A. He has three on his face, and one on his ear.

Q. Doctor, do you have an opinion as to whether or not these scars are permanent?

A. The scars are permanent.

Q. Do you think they will improve any from what they are?

A. I don't believe so."

Enlarged photographs of Randy were made exhibits in this case and we have carefully examined them. Although both exhibits appear to be made from the same exposure, we are able to detect only a small scar on the bridge of the nose and what appears to be a very small scar on the right cheek. The left ear is not visible in either of the exhibits. The doctor testified that Randy has three scars on his face and one on his ear. In attempting to show the scars to the jury, Dr. Hickey pointed out two scars on the face and one on the ear and then inquired of the jury if they could see them. The doctor's attention was then directed by counsel to a third scar on Randy's face, after which the doctor also recognized it as one of the scars.

We have concluded from the evidence of record in this case that there is no substantial evidence to sustain the judgment in the amount of $5,000. We are of the opinion that a judgment for $2,000 would be more in line with the damages Randy has sustained. Consequently, the judgment is affirmed upon remittitur of $3,000 within 17 calendar days; otherwise the judgment will be reversed and the cause remanded for new trial.

Fogleman, J., dissents.

John A. Fogleman, Justice, dissenting. I would affirm this judgment. I do not feel that I am in a better position than the jury to determine the amount of dam-

ages necessary to compensate this child for the nature, extent and duration of his injury, his pain and suffering and mental anguish, and his scars, disfigurement and visible results of his injury. It is true that the evidence of pain, suffering and mental anguish is not as extensive as usual in a personal injury case. This will necessarily be so in any case where the injured party is himself barred from testifying. See Ark. Stat. Ann. § 28-601 (Repl. 1962). Since there are few objective symptoms of the extent of pain, suffering and mental anguish there will always be a limited amount of evidence in such a case. Measuring the elements of damages set out above in dollars and cents is a difficult undertaking, and is best left to jurors unless there is a total absence of evidence, a clear indication of passion and prejudice or obvious error in application of the law in fixing the amount. I do not feel that either situation exists here. We have long recognized that compensation for pain and suffering must be left largely to the sound discretion of a trial jury and the conclusion reached by it should not be disturbed unless the award is clearly excessive. *Missouri Pacific R. Co. v. Hendrix,* 169 Ark. 825, 277 S. W. 337, cert. denied, 270 U. S. 651, 46 S. Ct. 351, 70 L. Ed. 781. Of course, mental anguish is only another form of pain and suffering.

There was medical evidence that Billy's scars are permanent. Dr. Hickey found lacerations of the face and the left ear. He pointed out three facial scars and one on the left ear. He said that the one on the left ear (not visible in the photographs in the record) was the one that was "so bad." He pointed out three facial scars, which appear evident to me from the black and white photographs exhibited. One is on the bridge of the nose, one is below the right eye, and the other on the right side of the face. I cannot join in drawing the inference that the doctor's inquiry whether the jury could see the scars was indicative of their insignificance. Even a photograph did not reveal all in one picture. The inquiry by the doctor was a natural one for anyone trying to exhibit the physical appearance of a five-year-old boy before a jury box so that all 12 jurors could have the same view. Anyone who has presented exhibits before a jury has

properly made such an inquiry. If we draw the inferences in favor of the verdict, the doctor's question means nothing more.

This child's father first saw him in the emergency room at the hospital. He described his son's face as a bloody mess, and cut all to pieces. The father said he passed out while watching the physician sew up the wounds. The boy's mother who took him to the hospital said he had blood all over him and was screaming. She said that his eyes were closed and his face twice its normal size on the day after the bite. She also said there was trouble about the healing of the wounds due to infection. When the person undergoing pain and anguish cannot testify, not much more in the way of evidence can be expected. The only evidence he was permitted to give had to come from observations of others.

Certainly there can be no doubt that this child was entitled to be compensated for his fright and mental pain and suffering which accompanied his physical injury. *St. Louis, I. M. & S. Ry. Co.* v. *Brown*, 97 Ark. 505, 134 S. W. 1194; *Lamden* v. *St. Louis Southwestern Ry. Co.*, 115 Ark. 238, 170 S. W. 1001.

While a motion for new trial is no longer required, no application was made to the circuit court, either for a new trial or for remittitur. The circuit judge was in a far better position to evaluate the evidence in the light of the requisites for declaring a verdict excessive than are we. It seems to me that we should treat this case exactly as did the Third Circuit Court of Appeals in *Zarek* v. *Fredericks*, 138 F. 2d 689 (1943), where Judge Goodrich, speaking for the court, said:

> The $4,000 awarded to the minor plaintiff, Vincent, seems somewhat high. There is evidence of medical treatment following the dog bite which, while no doubt painful, was not serious enough to require hospitalization. The eyesight is not impaired; on the other hand there is a slight droop of one eyelid. There are scars and they may be permanent. There is also testimony from a physician, the mother, and from a former principal of the boy's school with

regard to his nervous condition following the accident. It must be borne in mind that the injuries were non-pecuniary in their nature and to measure them by a yardstick of dollars is a difficult task at best. That is the jury's function. Here the jury has made its award and the trial judge was not dissatisfied with it. We do not think under these circumstances that the award, while overliberal, is so outrageous that we, as an appellate court, may interfere.